No. 3879

**Second Circuit**

———

**HERRINGTON v. MAGEE ET AL.**

———

(December 23, 1930. Opinion and Decree.)

———

McHenry, Montgomery, Lamkin and Lamkin, of Monroe, and Warren Hunt, of Rayville, attorneys for plaintiff, appellee.

George Wesley Smith, of Rayville, attorney for defendants, appellants.

ODOM, J. On August 2, 1928, the defendant John W. Magee shot the plaintiff L. Z. Herrington with a pistol and wounded him severely. Herrington brought this suit for damages against J. W. Magee and his son, alleging that the assault was provoked by defendant; that the shooting was done willfully, maliciously, and without justification or excuse.

Defendant J. W. Magee, Sr., admitted in answer that he shot plaintiff, but denied generally plaintiff's other allegations, and especially pleaded that he shot plaintiff in self-defense. The defendant J. W. Magee, Jr., denied any connection whatever with the shooting.

The law in cases of this kind is so plain that it hardly need be stated. Certainly if defendant made an unprovoked assault upon plaintiff with a deadly weapon and wounded him he must compensate the resulting damage. On the other hand, if plaintiff himself provoked or brought on the difficulty he cannot recover.

Counsel for defendant on behalf of his client invoked the well-established rule that:

"He who is in fault and sues for damages resulting therefrom cannot recover for the injuries inflicted on him, although the perpetrator was not justified in law in his conduct."

The leading cases in point are cited in the case of Lide v. Parker, 6 La. App. 648, decided by us in 1927. But see Massett v. Keff, 116 La. 1107, 41 So. 330, and Fontenelle v. Waguespack, 150 La. 316, 90 So. 662.

It is contended that the conduct of plaintiff toward defendant on the day previous to the shooting should be considered in connection with the final assault. We do not think so for reasons which we shall presently state. It is also contended that on the day and at the time of the shooting plaintiff made such hostile demonstrations toward defendant as to provoke him into taking the steps he did. We do not agree with, that view either.

Plaintiff and defendant are white men and live in a rural section of Richland parish. Plaintiff lived on defendant's place and cultivated his land in 1927 and, from some of the testimony we infer, worked under the share system. He left defendant's place at the end of the year and evidently something occurred to cause hard feelings between the two. At any rate, on August 1, 1928, the two met at or near the Cypress Creek bridge on a logging road which runs from a tie mill west to the main highway leading from Delhi north to Oak Grove. The parties both live in the vicinity and both farm. When they met in the road, defendant opened the conversation by asking plaintiff why it was he passed him without speaking. Whereupon plaintiff replied, "You have accused me of stealing your peas," or words to that effect. Defendant's retort was that plaintiff's daughter had spent the previous night at his house and that she told him plaintiff had picked several hundred pounds of peas and had set aside only two basketsful for defendant and "if this is not stealing, what is it?" or words of similar import. Hot words ensued, plaintiff called defendant a liar, defendant applied an unmentionable epithet toward plaintiff, defendant, so plaintiff says, threatened to beat him to death, plaintiff drew his knife and threatened to carve defendant down to his size,

and defendant, seeing plaintiff's knife, left the scene and walked down the road. This took place in the road near Dritt Bruce's house. After defendant left, plaintiff went into Dritt Bruce's house and got a shotgun. He says it belonged to him and it did, and at one time he said he got it for the purpose of carrying it home, and again that he got it to defend himself. But he did not use it, although when he walked out with it he and Mrs. Bruce say defendant was still within range. From the testimony given mainly by the two participants it is difficult to determine which one was in fault in bringing on this first encounter. Defendant admits, however, that he opened the conversation in the road by asking why plaintiff was passing without speaking. Evidently defendant knew the state of plaintiff's mind. He practically admits that he had accused plaintiff of stealing peas, which accusation he knew plaintiff resented. Defendant did not, we think, approach plaintiff in a pleasant state of mind, and under the circumstances the remark to him was not calculated to bring forth a soft answer, nor did it, but on the contrary brought forth an eruption, insults, and assaults, not resulting, however, in a physical encounter.

But defendant contends that plaintiff was at fault. However, if he was, his conduct on that occasion was no excuse or justification for the assault which defendant made upon him the following day. This occurred the day before the shooting. The parties separated and went to their respective homes, and neither followed up that wordy and heated encounter until the following day, after each had time to cool and reflect. Neither party had a legal right to again bring it up or to provoke the other to action on account of it. So far as the record discloses the plaintiff was in no wise disposed to follow it up.

But according to the undisputed testimony defendant did follow it up on the following day, when he made what we hold was an unprovoked and wholly inexcusable attack upon the plaintiff.

The tie mill which we have mentioned is located about one-half mile east of the main highway and is reached over a logging road which crosses Cypress Creek over a bridge. There is a logging camp located near the bridge on the east side of the creek. The tie mill is one-quarter of a mile from the camp. Ties and logs are hauled from the mill and surrounding woods over the logging road to the main highway and thence to the railroad. The defendant had a contract to haul ties, and a man named Dritt Bruce was hauling logs with a wagon and a four-up mule team. On the morning of August 2, 1928, the day after the first meeting of these parties, the defendant and his sons went out to the tie mill, got a load of ties, and came back to the camp at the bridge preparatory to carrying them on west over the logging road to the highway. Just before they got to the camp, Dritt Bruce and his son, Jimmy, drove by with a load of logs going in the direction defendant intended to go. About the time or just before defendant and his sons reached the camp with their load, the plaintiff Herrington crossed the bridge and walked west on the road following Bruce. The elder Magee, the defendant who did the shooting, saw Herrington cross the bridge and immediately left his sons with the load of ties and followed plaintiff at a rapid pace. He was then

armed with a pistol which he was carrying in his shirt bosom. Plaintiff looked back and saw defendant overtaking him. When plaintiff caught up with the Bruce log wagon, he climbed upon it, taking a place upon the tongue or hounds of the wagon between the mules and the front end of the logs. He was not armed at the time. Then defendant, by walking rapidly overtook the wagon at the top of the hill in front of Bruce's house. When he did so he walked around the wagon and up to where plaintiff was standing and immediately opened fire upon him. He shot at plaintiff five times, two bullets striking him, one on the upper part of the chest and the other on the arm.

Dritt Bruce was riding one of the wheel mules and his son Jimmy the other. Jimmy says if defendant said anything before beginning to shoot he did not hear it, but Dritt Bruce and plaintiff both say that about the moment defendant opened fire he said to plaintiff, "———— damn you, have you got your gun?" All agree that he began to shoot the moment he got to where plaintiff was.

Now defendant says he shot plaintiff because he was trying to get hold of an axe which was in a leather scabbard on the wagon tongue and that he was afraid plaintiff would do him bodily harm. That is his defense. Whether plaintiff was trying to get hold of the axe or not is a disputed point, but if he was that does not help defendant's case one whit because he was the aggressor and brought on the difficulty.

It is an established rule of law that he who provokes and brings on a personal encounter with another thereby forfeits his right of self-defense. Defendant left his sons and his load of ties and followed plaintiff up the road one hundred fifty yards. His attitude was hostile and threatening. Plaintiff saw him following down the road at a rapid pace, and in view of what had happened the day before he had reason to believe that defendant would attack him. Under the circumstances plaintiff was fully warranted in preparing, if he did, for the anticipated attack.

Again, defendant says he did not intend to stop at the wagon, but to pass it and go on to his home, which was further west. We cannot accept as true such statement, because when he had emptied his pistol, instead of proceeding on toward his home as he said he intended to do, he at once turned and went back east to where he left his sons and his truck. Every indication points to the conclusion that defendant's purpose in going down the road was to catch up with plaintiff and have it out with him.

The trial judge in his reasons for judgment said:

"The testimony shows the shooting was done by John W. Magee, Senior and that it was done without justification or legal cause or in self defense."

We fully agree with him.

The suit was brought against both John W. Magee and his son. We also agree with the trial judge that the testimony does not warrant a verdict against the son.

On the quantum of damage:

There was judgment for plaintiff for $2,756.60. As plaintiff proved that he had expended approximately $256 for hospital and medical bills, we assume that the court fixed the damage for the personal injuries

at $2,500. We do not think that amount is adequate.

One bullet entered plaintiff's body somewhat in front of the shoulder joint and approximately two inches beneath the outer end of the collar bone, ranging down, penetrating the lower intestines in three places and lodging in front of and slightly above the right hip joint, where it still remains.

Immediately after the shooting plaintiff was rushed to a sanitarium in Vicksburg, where Dr. Tiswell performed what he referred to as an exploratory operation and closed the three punctures in the lower intestines; the bullet having been already located by use of the X-ray. Plaintiff remained in the sanitarium eleven days, where the doctors say he suffered excruciating pains. After going to his home he stayed in bed for thirty days, after which he walked on crutches for some time due to the injury to the hip joint where the bullet lodged. Dr. May and Dr. Tiswell both say that he is a cripple for life. The plaintiff himself says that he has not been able to stand for any length of time or to do work of any character and his testimony is not disputed. He is still under treatment of a physician. Owing to the very serious character of the wound and in view of the unqualified opinion of the physicians who testified that plaintiff is permanently crippled, we think the award should be increased to $4,756.60.

For the reasons assigned it is ordered that the judgment be increased from $2,756.60 to $4,756.60, and that as thus amended it be affirmed with all costs.